Date signed November 25, 2014



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| LAWRENCE ANDREW RICH | : | Case No. 13-11456PM |
| | : | Chapter 7 |
| Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| DESERT PALACE, INC. | : | |
| d/b/a Caesars Palace of Las Vegas | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 13-00167PM |
| LAWRENCE ANDREW RICH | : | |
| Defendant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| ARIA RESORT & CASINO | : | |
| HOLDINGS, LLC | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 13-00262PM |
| LAWRENCE ANDREW RICH | : | |
| Defendant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| BELLAGIO, LLC | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 13-00263PM |
| LAWRENCE ANDREW RICH | : | |
| Defendant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| THE MIRAGE CASINO-HOTEL | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 13-00264PM |
| LAWRENCE ANDREW RICH | : | |
| Defendant | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

## MEMORANDUM OF DECISION

The Plaintiffs, Desert Palace, Inc., d/b/a Caesars Palace of Las Vegas ("Caesars"), Aria Resort & Casino, LLC ("Aria"), Bellagio, LLC ("Bellagio") and The Mirage Casino-Hotel ("Mirage"), seek a ruling of this court that the sums they are owed, that is, $450,000.00, $200,000.00, $150,000.00, and $150,000.00, respectively,[1] are excepted from discharge by virtue of 11 U.S.C. § 523(a)(6), that states:

**11 U.S.C. § 523.  Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

Lawrence Andrew Rich ("the Debtor"), a long-time gambler, who began gambling at a higher level in 2005, played Blackjack or Twenty-One, generally taking up two positions at the table and placing bets from $3,000.00 up to $20,000.00 a hand.  He had lines of credit of $150,000.00 or more at most of the casinos and was given preferred status that resulted in his being provided with, while on his gambling visits, free rooms, meals, transportation and other benefits, including rapid extensions of credit.  In playing Blackjack, the Debtor understood that the casinos' winning edge at this game was the smallest of any of the casino games.  That is, the odds were approximately 50.5% to 49.5% against the gambler.[2]

To facilitate the Debtor's play at their facilities, the casinos arranged that when the Debtor needed chips to gamble, he could activate his line of credit by signing a "marker" at the

---

[1] Two other complaints were filed challenging the dischargeability of claims for unpaid gambling debts or markers -- *Harrah's Atlantic City Operating Company LLC v. Rich*, Adversary Proceeding No. 13-00266, and *Boardwalk Regency Corporation d/b/a Caesars Atlantic City v. Rich*, Adversary Proceeding No. 13-00267.  Harrah's claim of $195,000.000 was settled for the sum of $10,000.00, plus filing fees, and Boardwalk's claim of $345,000.00 was settled for the same amount.

[2] In 1961, an MIT mathematician, Edward O. Thorpe, wrote a paper for winning at Blackjack and discovered by card counting the gambler could gain an edge over the house.  The casinos retaliated by banning card counters from playing and by using six or eight decks of cards.  Elwyn Berlekamp, *Bettor Math*, (Review) AMERICAN SCIENTIST, Vol. 93, Issue 6 (2005). *Cf*. THE WIZARD OF ODDS, "House Edge of Casino Games Compared," http://wizardofodds.com/gambling/house-edge/ (last updated December 9, 2013).

cage, the financial hub of the casino. Under Nevada law, casino markers are treated like checks (*see Fleeger v. Bell*, 2001 WL 1491252 (CA9 2001); N.R.S. 205.130(1)), and, in fact, look like checks, such as Plaintiffs' (Aria, Bellagio and Mirage) Exhibit 12, executed on or before February 26, 2012, and presented to Sandy Spring Bank for collection sometime on or after April 13, 2012. That marker, in the amount of $150,000.00 made payable to The Mirage, states:

> I acknowledge receiving the above amount and I have funds on deposit in accounts on which I am an authorized signatory for all purposes, without restriction, sufficient to pay this negotiable instrument marker upon demand. I authorized THE MIRAGE to obtain my financial information from any source and complete this marker as necessary for the marker to be presented for payment. . . . A credit instrument is identical to a personal check. Willfully drawing or passing a credit instrument knowing there are insufficient funds in an account upon which it may be drawn, or with the intent to defraud, is a crime in the State of Nevada which may result in criminal prosecution.

The statement about having funds on deposit in accounts on which the gambler is an authorized signatory sufficient to pay the negotiable instrument on demand is an amiable fiction that neither the player nor the casino believes true. The casinos appreciate that most of their bettors may not have funds on deposit. On the other hand, the representation is a powerful weapon to enforce collection under the Nevada Revised Statutes by the threat of prosecution for a crime. In presenting the marker, the gambler must admit all the elements of that crime. Here, the casinos had actual knowledge of the approximate amount of funds that this preferred customer had on hand from the annual inquiries made to his designated bank. The information returned showed an account with a balance in four figures.

There is nothing in the record to support the conclusion that the casinos, at the time the marker was signed by the Debtor and the chips released, relied on *any* representation that funds to cover the debt were on deposit in the designated account at the time the marker was presented. If the casinos believed and relied on the representation that the money "was in the bank" they would not wait 30 to 60 days to present the unredeemed markers to the gambler's bank, as is their practice.

During the period from January 14 through February 27, 2012, the Debtor signed and issued several markers to the Plaintiffs and other casinos, many of which were redeemed. Thirty-two were not. At the end of the period, these markers aggregated $2.5 million. On March 8, 2012, shortly after this string of losses, the Debtor sent an email to Caesars (Defendant's Exhibit 18):

I am writing to unfortunately inform you that I will not be able to cover my current outstanding markers due to Caesars Palace, Caesars Atlantic City, or Harrahs [sic] Atlantic City at this time. I want to pay them off and clear this up, but I have recently suffered a series of bad losses coupled with the fact that recent unforeseen problems have caused company cash flow problems and therefore myintended [sic] source to pay off these and other markers at other casinos is no longer available to me at this time. Writing this email is both embarrassing and humiliating. I have suffered numerous substantial losses in the past and have always paid them off on time. Unfortunately, at this time I got in over my head and will not be able to pay right away. I never intended to not be able to pay these markers off when they were due. Please understand that I fully intend to pay these debts over time. However, I am asking that you consider a long term payment plan option in lieu of other action at this time. I believe that my loyalty and good history of payments should warrant this type of accommodation. I would appreciate it if we could talk over the coming days to discuss a plan for resolving this. I am not looking to walk away or ignore this substantial issue. (Omitted contact information provided by the Debtor).

The Debtor attempted to work out a program to cover the payment of the casinos with 20% down and the balance paid over four years. These arrangements came to naught when one casino, Wynn's Las Vegas, demanded payment of its $250,000.00 marker within one year. This made the workout impossible for the Debtor as the other casinos would not agree to Wynn being paid first. Throughout his gambling career prior to 2012, the Debtor had covered every marker that he left at casinos. Following his communication, *above*, some of the Las Vegas casinos sought the assistance of the District Attorney and, on or about September 7, 2012, the State of Nevada initiated criminal proceedings against the Debtor in the Justice Court for Las Vegas Township, Clark County, Nevada, Case No. C-13-286929. The Information filed informed the state court that the Debtor "committed the crimes of DRAWING AND PASSING A CHECK WITHOUT SUFFICIENT FUNDS IN DRAWEE BANK WITH INTENT TO DEFRAUD," a Category D Felony under Nevada Revised Statutes 205.130 and 205.132. Plaintiffs' (Aria, Bellagio and Mirage) Exhibit 2. The cited statutes provide (in pertinent part):

### 205.130. Issuance of check or draft without sufficient money or credit: Penalties

1. Except as otherwise provided in this subsection and subsections 2 and 3, a person who willfully, with an intent to defraud, draws or passes a check or draft to obtain:

    (a) Money;

    (b) Delivery of other valuable property;

(c) Services;

(d) The use of property; or

(e) Credit extended by any licensed gaming establishment,

drawn upon any real or fictitious person, bank, firm, partnership, corporation or depositary, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the State during a period of 90 days, is in the amount of $650 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.

**205.132. Issuance of check or draft without sufficient money or credit: Presumptions of intent to defraud and knowledge of insufficiency; malice in causing prosecution**

1. In a criminal action for issuing a check or draft against insufficient or no funds with intent to defraud, that intent and the knowledge that the drawer has insufficient money, property or credit with the drawee is presumed to exist if:

(a) The instrument is drawn on a purported account which does not exist.

(b) Payment of the instrument is refused by the drawee when it is presented in the usual course of business, unless within 5 days after receiving notice of this fact from the drawee or the holder, the drawer pays the holder of the instrument the full amount due plus any handling charges.

(c) Notice of refusal of payment, sent to the drawer by registered or certified mail at an address printed or written on the instrument, is returned because of nondelivery.

2. If a complainant causes a criminal action to be commenced for issuing a check or draft with intent to defraud and refuses to testify in the action, the complainant is presumed to have acted maliciously and without probable cause.

These statutes are a boon to the casinos in that they facilitate collection -- the gambler's guilt is presumed. There is no dispute that the Debtor pleaded guilty to having passed all of the 19 markers identified in the Information "willfully and unlawfully, with intent to defraud," by drawing and passing 23 checks (markers) when he had insufficient money or credit with the drawee of the instrument to pay it in full upon presentation, as provided in Nevada Revised Statutes 205.130(1). The Debtor pleaded guilty on January 30, 2013, to the Information to avoid imprisonment, as there is no possible defense to this strict liability statute. The parties stipulated

to a term of probation and the Debtor agreed to a Judgment of Conviction reflecting restitution owed the "victims" aggregating $1,450,000.00.[3]  Plaintiffs'(Aria, Bellagio and Mirage) Exhibit 1.  The Guilty Plea Agreement further provided: "If Defendant successfully completes all terms of the probation, to include paying full restitution and any outstanding bad check unit statutory fees, he may withdraw his plea, and the charges will be dismissed."

But, these adversary proceedings are not based on allegations of fraud but rather whether the Debtor willfully intended to injure the casinos by continuing to gamble with chips obtained by signing markers (that were approved by the appropriate credit authority within the casino). To prevail, the Plaintiffs must establish the elements of § 523(a)(6) by a preponderance of the evidence.  *See, e.g., Grogan v. Garner,* 498 U.S. 279, 291 (1991)*; In re Strack,* 524 F.3d 493, 497 (CA4 2008); *In re Rountree,* 478 F.3d 215, 220 (CA4 2007).  In *Kawaahau v. Geiger*, 523 U.S. 57, 61 (1998), the Court had before it a § 523(a)(6) case involving a malpractice action. The Court opined that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  The result is that, as pointed out in *In re Williams*, 337 F.3d 504 (CA5 2003)(*citing Kawaahau* at pp. 61-62), the language of § 523(a)(6) mirrors the definition of an intentional tort which requires an actor to intend the consequences of an act and not simply the act itself.  The seminal Fourth Circuit case on § 523(a)(6) is *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003 (1985), a case where a debtor agreed with his bonding company to place $250,000.00 in an attorney's trust account so that the remainder of funds due from the Navy could be paid to him, but instead used the money to buy real estate and luxury goods for himself. The Fourth Circuit found that while specific malice is not required to be shown to prove dischargeability, the defendant was responsible for having acted deliberately and intentionally in knowing disregard of the rights of another.  *Id.* at 1008, *citing Bennett v. W.T. Grant*, 481 F.2d 664 (CA4 1973).  In other words, as stated in the case of *In re Eagleston*, 236 B.R. 183, 188 (BC Md. 1999), "[a] successful cause of action pursuant to Section 523(a)(6) requires the plaintiffs to prove that the debt arose from willful harm done with the intent to cause injury."  *See also*, *In re*

---

[3]  The stated restitution was $250,000.00 to Wynn Las Vegas; $250,000.00 to The Cosmopolitan Las Vegas; $150,000.00 to Bellagio; $200,000.00 to Aria; $450,000.00 to Caesars; and $150,000.00 to Mirage.

*Beale,* 253 B.R. 644, 648 (BC Md. 2000) (applying D.C. law.)  Likewise, as this court stated in the case of *In re Abell*, 2013 WL 4170194 (BC Md. 2013):

> The test for willful and malicious injury under § 523(a)(6) requires only a simple inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor.  *In re Williams*, 337 F.3d 504, 508 (CA5 2003) (*quoting In re Miller*, 156 F.3d 598, 605 (CA5 1998). "[A] debtor must commit an intentional or substantially certain injury in order to be deprived of a discharge." *Id.* at 509. "[I]ntent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *Texas v. Walker*, 142 F.3d 813, 823 (CA5 1998) (*citing In re Delaney*, 97 F.3d 800, 802 (C.A.5 1996). Under § 523(a)(6), "willful means deliberate or intentional ... and malicious means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Matter of Thirtyacre*, 36 F.3d 697, 700 (CA7 1994). '[W]illful and malicious injury' means a deliberate or intentional act in which the debtor knows his act would harm the creditor's interest and proceeds in the [face] of the knowledge." *In re Cunningham*, 59 B.R. 743, 746 (BC N.D.Ill.1986).

*See also In re Parks*, 91 Fed. Appx. 817, 819 (CA4 2003)(Quoting *In re Miller*, 156 F.3d 598, 603 (CA5 1998):  "The test, then, is whether the debtor acted with "substantial certainty [that] harm [would result] or a subjective motive to cause harm.")).  *See In re Conte*, 33 F.3d 303, 307 (CA3 1994); *In re Su*, 290 F.3d 1140, 1143-45 (CA9 2002).

In applying these principles to the case at hand, one answer could be that the Debtor intended to harm the casinos when he signed the markers because he expected that the odds would turn in his favor, that he would play and win and ultimately redeem the markers and more. But, there is nothing in this record that the Debtor intended to injure the casinos. The Debtor only wished to continue to gamble at the casinos' invitations and use the lines of credit as he had for many years.  The court finds as a fact that when the dust settled, and the Debtor saw the magnitude of his loss, he intended to repay the casinos, albeit not as quickly as one entity wished.  There is nothing to indicate that he intended to injure any one of the creditors, particularly at the time he signed the markers or at any time before or after.  Throughout the period covered by this adversary proceeding, he had numerous sessions where he won and redeemed his markers, and there is nothing to indicate that he would have done otherwise with respect to the markers at issue.  Furthermore, the court finds nothing in this record that would cause it to imply malice from the Debtor's actions.  There are no surrounding circumstances to lead to the conclusion and certainly no evidence of any motive to cause harm to the casinos by using markers. There is nothing to show that he intended to use the chips improperly, such as by

selling them to another gambler at a discount.  He procured the chips for the purpose for which they were intended -- to bet with.  And, bet he did.  If he caused harm to the casinos, in the light of the surrounding circumstances, that harm could not be said to have been substantially certain to result.  This was not a case of discharging a pistol in a crowded bar or intentionally driving into a group of pedestrians crossing the street where injury is certain to occur.  As has been said, numerous markers in this period were redeemed.  Reckless the Debtor may have been to continue to gamble beyond his ability to repay the casinos immediately, but the court can find no evidence of malice, express or implied.

For the above reasons, the complaints will be dismissed.  An order will be entered in accordance with the foregoing.

cc: All parties

**End of Memorandum of Decision**